IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| W.R., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION FILE |
| | ) | NO. |
| RED ROOF INNS, INC.; RRI WEST | ) | |
| MANAGEMENT, LLC; and | ) | |
| RRI III, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff W.R. in the above-styled action and hereby files her

Complaint as follows:

1.

This case arises out of the sex trafficking of Plaintiff W.R. at the corporately

owned and operated Red Roof Plus+ located at 1960 North Druid Hills Road NE,

Atlanta, Georgia 30329 (hereafter, the "Buckhead Red Roof").  Given the nature of

the case, Plaintiff is identified in this Complaint only by her initials to prevent

public disclosure of her name.  W.R.'s counsel has either previously disclosed

W.R.'s full name to defense counsel or will immediately upon identification of

counsel.  Upon information and belief, all parties consent to proceeding by using

W.R.'s initials.[1]

### Parties, Jurisdiction, and Venue

2.

W.R. is a citizen of the United States of America, is a resident of the State of

California, and consents to the jurisdiction of this Court.

3.

At all times relevant to this complaint, Defendants Red Roof Inns, Inc.

("RRI"), RRI West Management, LLC ("RRI West"), and RRI III, LLC ("RRI

III"), (collectively, "Defendants") jointly owned, managed, supervised, operated,

oversaw, controlled the operation of, and/or were inextricably connected to the

renting of rooms at the Buckhead Red Roof, from which they benefited financially.

4.

RRI III, LLC is a Delaware limited liability company with its principal place

of business in Houston, Texas.  It regularly conducts business in the State of

Georgia, derives substantial revenue from services rendered in Georgia, and has

---

[1] Contemporaneously with this Complaint, Plaintiff has filed a Motion for
Protective Order and Leave to Proceed Anonymously based on the nature of the
allegations in the Complaint.

committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia.  RRI III may be served with process by serving its registered agent CT Corporation System, 289 S. Culver Street, Lawrenceville, Georgia, 30046.

5.

Jurisdiction and venue are proper as to RRI III, and RRI III was properly served with process in this action.

6.

RRI is a Delaware corporation with its principal place of business in New Albany, Ohio.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within and outside Georgia, resulting in injuries in Georgia. RRI may be served with process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

7.

Jurisdiction and venue are proper as to RRI, and RRI was properly served with process in this action.

8.

RRI West is a Delaware limited liability company with its principal place of business in Houston, TX. It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. RRI West may be served with process by serving its registered agent Capitol Services, Inc. at 1675 S State St. Suite B, Dover, DE 19901.

9.

Jurisdiction and venue are proper as to RRI West, and RRI West was properly served with process in this action.

10.

This court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because W.R. asserts claims arising under 18 U.S.C. 1595(a), and pursuant to 28 U.S.C. § 1367 because W.R.'s state law claims form part of the same case and controversy as her federal law claims.

11.

Venue is proper in this district pursuant to 28 U.S.C. § 1391 as the incidents forming the basis of this complaint occurred in Dekalb County, Georgia, within the Northern District of Georgia, Atlanta Division.

## The Defendants' Roles

12.

Though RRI III held title to the Buckhead Red Roof and was purportedly a franchisee of RRI, RRI directly operated and employed all employees of the Buckhead Red Roof, giving RRI specific and direct knowledge of prior and ongoing crime, including prostitution and sex trafficking occurring at the Buckhead Red Roof both before and during Plaintiff's trafficking.

13.

RRI West was the manager of the Buckhead Red Roof during all times relevant herein.

14.

At all times relevant hereto, Defendants owned, operated, maintained, controlled, and managed the Buckhead Red Roof as a joint venture, sharing valuable information, data, responsibilities, and financial benefits from the hotel's operation, and each having rights of mutual control over the hotel and each other.

15.

Whenever reference is made in this complaint to any act, deed, or conduct of a Defendant, the allegation is that the Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or

representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendant.

## RRI Employee Knowledge and Complicity

16.

Defendants knew of, condoned, and permitted widespread prostitution and sex trafficking, including minor sex trafficking, at the Buckhead Red Roof.

17.

In addition to providing a market to sex traffickers as part of their hotel operations, Defendants actively facilitated the ongoing sex trafficking at its premises through its hotel employees, who served as lookouts for sex traffickers, alerting them to the presence of law enforcement at the hotel.

18.

Prior to Plaintiff's trafficking at the Buckhead Red Roof, RRI employees actively solicited men to purchase sex from women being sold for sex at the hotel. These employees showed online advertisements of women and girls being sold for sex on Backpage.com and Craigslist.com to men looking for commercial sex at the Buckhead Red Roof. These employees would show the men various women and girls that RRI employees knew were at the hotel being sold for sex and, after the

man made a selection, would send the men to the rooms in which those women and girls were being sold for sex.

19.

Before and during Plaintiff's trafficking, RRI employees at the Buckhead Red Roof called sex traffickers to warn them when law enforcement was present at or coming to the hotel, or to warn them to slow down or stop traffic to a particular room in order to assist the trafficker in evading detection from other guests or the police.

20.

Before and during Plaintiff's trafficking, RRI employees at the Buckhead Red Roof purchased drugs from sex traffickers at the hotel.

21.

Prior to Plaintiff's sex trafficking at the Buckhead Red Roof, RRI employees at the hotel knew or should have known that rooms at the Buckhead Red Roof were frequently rented for short term use for commercial sex with guests, usually men, renting a room at the hotel, using it for a short period of time, and then leaving and not returning to the hotel.

22.

Prior to Plaintiff's sex trafficking at the Buckhead Red Roof, RRI employees at the hotel spoke to Jay Moyer, Director of Operations for RRI, and Vince Vittatoe, the Director of Safety and Security for RRI, about the constant and ongoing crime and prostitution at the Buckhead Red Roof.

23.

Prior to and during Plaintiff's sex trafficking at the Buckhead Red Roof, hotel security guards were aware of several sex traffickers who worked out of the hotel and who sold young women like W.R. for sex at the hotel.  A hotel security guard reported these traffickers and young victims to hotel employees but were told to ignore it because the traffickers were "paying customers."

24.

Hotel employees have testified that prior to W.R.'s trafficking the employees at the Buckhead Red Roof permitted obviously young girls to be sold for sex by traffickers at the hotel.

25.

Prior to Plaintiff's trafficking, Mr. Moyer devised a plan by which to reduce complaints at the hotel.  Mr. Moyer's plan was to allow "straight" guests and families to be placed in the front of the hotel, but to put criminal drug dealers and

sex traffickers of children and women into the back corner of the hotel, where they would attract less attention from the non-criminal guests.  This was the hotel's policy before and during Plaintiff's trafficking at the hotel.

### Plaintiff's Sex Trafficking at the Buckhead Red Roof

26.

When she was only 18 years old, Plaintiff was trafficked for sex on different occasions by different traffickers at the Buckhead Red Roof, where Plaintiff was an invitee, from March of 2016 until June of 2016.  During these stays, Plaintiff was trafficked for up to two weeks at a time at the Buckhead Red Roof.

27.

At times, Plaintiff was trafficked at the Buckhead Red Roof with another victim of sex trafficking.  During those occasions, each victim engaged in commercial sex with more than 10 different buyers per day.  Defendants knew or should have known that the number of daily, older male visitors to the room was obviously indicative of not only prostitution, but also of sex trafficking, and Defendants negligently failed to control or monitor the frequent male visitors.

28.

On at least one occasion, Plaintiff and the other victim were forced to have sex with so many buyers in one day that it damaged their vaginas and became too

painful to have sex, so they refused to see additional buyers.  As a result, Plaintiff was viciously beaten at the hotel by her trafficker because she did not have enough money to satisfy him.  Plaintiff then ran from the hotel room crying and into the hotel's front office pleading to staff for help, but no one helped her.

29.

Plaintiff's sex traffickers operated openly and brazenly at the Buckhead Red Roof, as did a number of other sex traffickers. When Plaintiff was trafficked at the Buckhead Red Roof, multiple other traffickers operated at the hotel and several other victims were trafficked for sex at the hotel.  As a result, a large number of buyers frequented the hotel each day.

30.

Plaintiff's traffickers constantly monitored her movements at the Buckhead Red Roof, activity which was seen by hotel employees.

31.

Plaintiff and other trafficking victims frequently appeared throughout the hotel and on the hotel premises and approaches, scantily-clad, wearing very little clothing throughout the hotel property.

32.

While Plaintiff was trafficked for sex at the Buckhead Red Roof, she

exhibited numerous well-known and visible signs of a sex trafficking victim, of which Defendants knew or should have known, including her inappropriate appearance, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, no control of or possession of money, loitering, soliciting male patrons, and monitoring and control by her trafficker.

33.

While trafficked at the Buckhead Red Roof, Plaintiff's rooms evidenced numerous well-known and visible signs of sex trafficking of which Defendants knew or should have known.  Frequently, the trash cans in the rooms in which Plaintiff was trafficked contained an extraordinary number of used condoms and condom wrappers, the rooms contained multiple cell phones, and Plaintiff or her trafficker frequently requested an excessive number of towels from housekeeping.

34.

Prior to and during Plaintiff's trafficking at the Buckhead Red Roof, the premises and its approaches were well known for crime, prostitution, and sex trafficking, which is why Plaintiff's sex trafficker brought Plaintiff and another victim to the Buckhead Red Roof to be sold for sex.  Defendants provided a busy market for just that type of illegal activity.

35.

In the years prior to and during Plaintiff's sex trafficking at the Buckhead Red Roof, Defendants knew or should have known that at least a dozen other women and minor children were also sex trafficked at the hotel by a variety of sex traffickers.[2]

**Defendants' Knowledge of Sex Trafficking Generally**

36.

Defendants knew or should have known of the existence of sex trafficking and its illegality since the passage of the Trafficking Victims Protection Act in 2000, and the United Nations' adoption of the Palermo Protocol, to prevent, suppress, and punish trafficking in persons.

37.

Defendants knew or should have known, at least by 2013, that Atlanta was a hub of sex trafficking and that the crime was prevalent in the city, including at Defendants' hotels.  According to a well-publicized study commissioned by the

---

[2] These victims are either plaintiffs or witnesses identified as sex trafficking victims in other cases in the Northern District of Georgia, in which protective orders have been entered protecting their identities.  Defendants either already know or will be informed of the identities of these additional victims in Plaintiff's initial disclosures.

U.S. Department of Justice, Atlanta had one of, if not the, largest illegal sex

trafficking economies in the country.  In 2007, Atlanta's sex trafficking economy

was worth $290 million annually, and traffickers reported average *weekly* earnings

of roughly $33,000.

38.

Hotels and motels are "a particularly attractive site for criminal activity

ranging from drug dealing and prostitution to human trafficking.  Offering privacy

and anonymity on the cheap, they have been employed as . . . rendezvous sites

where child sex workers meet their clients on threat of violence from their

procurers[.]"  *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457 (2015) (Scalia, J.,

dissenting, joined by Chief Justice Roberts and Justice Thomas).

39.

Without a market, a place for the buying and selling of humans for sex, sex

trafficking would cease to exist. Defendants, for a fee, provided that market, a

private and anonymous market for W.R. to be sold for sex at their hotel.

40.

Despite actual knowledge of rampant crime, prostitution, and sex trafficking

at Red Roof branded hotels, including the Buckhead Red Roof, RRI and RRI West

have a long history of condoning and permitting prostitution and sex trafficking at its hotels so long as it remains profitable for Defendants to do so.

41.

Defendants knew or should have known that its hotels, including the Buckhead Red Roof, were well known around the country as havens for sex trafficking.  Sex trafficking at Red Roof Inns nationwide have been widely reported for years.  Nonetheless, Defendants chose to continue to profit from the sex trafficking and prostitution at its hotels, including the Buckhead Red Roof.

**Defendants' Knowledge of Prior Crime at the Buckhead Red Roof**

42.

Before and during Plaintiff's sex trafficking at the Buckhead Red Roof, Defendants' employees knew or should have known about crime, prostitution, and sex trafficking, which was obvious at the Buckhead Red Roof.

43.

The Buckhead Red Roof employed only a single night shift employee at the time of, and prior to Plaintiff's sex trafficking at the hotel.  During the night shift, this employee stayed locked in the lobby for their own safety.

44.

Prior to Plaintiff's sex trafficking, Defendants knew or should have known of sex crimes, violent crimes, and significant drug activity at the Buckhead Red Roof, but negligently failed to take any steps to protect their invitees, including Plaintiff.  Specifically, Defendants knew or should have known of the following crimes, among others, occurring on their premises and approaches:

a. On or about April 2010, a young woman was **sexually assaulted and raped** at the Buckhead Red Roof.

b. On or about September 2011, the Dekalb County Vice Unit conducted an undercover operation at the Buckhead Red Roof "**in reference to illegal drug activity and prostitution.**"

c. On or about November 2011, police made a drug arrest in the parking lot at the Buckhead Red Roof during a routine patrol of the area, which they noted was "**known to be an area heavy in drug sales and prostitution.**"

d. On or about November 2011, while on patrol at the hotel, a location police described as "known for prostitution and drug activity," Dekalb County Police arrested a women for **loitering for sex** and noted that she was the "female listed on [a] website for implied prostitution."

The woman "**admitted that she ha[d] been prostituting out of room #307 for the past day**" and "was at another room previously during the week but moved" after police showed her "the ad, which clearly show[ed] her face and body."

e. On or about March 2012, police recovered a suitcase  guests had thrown of the third-floor balcony containing "**a large block of compacted green leafy substance which smelled and appeared to be Marijuana… wrapped by plastic.**"

f. On or about March 2012, Police increased patrols in the area around the Buckhead Red Roof after a **"recent shooting"** at the location.

g. On or about May 2012, police responded to a call from the Buckhead Red Roof security guard and night clerk, who called police after they received a report of a loud disturbance in a room "that sounded like a possible assault."  The guard and night clerk told police that when they went to the room to investigate, they saw two people leave the room and rush to a car in a "hurried manner."  Once in the room, the security guard and night clerk found blood on the door, "blood spatters on the floor and on the bed," and broken glass on the floor near the microwave and door.

16

h.  On or about June 2012, Dekalb County Police patrolling the area
    arrested a man in the parking lot of the Buckhead Red Roof after a
    search on his car uncovered "several small baggies for distribution, 12
    syringe needles, 2 prescription bottles containing 4 pink prescription
    pills (suspected methadone)," and "a small baggie containing a white
    powder substance" that "field tested positive for methamphetamine"
    from the arrestee's pocket.

i.  On or about September 2012, United States Marshals were dispatched
    to the Buckhead Red Roof "in reference to a wanted person believed
    to be staying" there. They located the wanted person in a room with "a
    scale with white powder and a hand gun with the serial number filed
    off… laying in plain sight."

j.  On or about April 2013, police responded to the Buckhead Red Roof
    after an armed robbery of a man and woman.  The female victim
    reported to police that the night before her pimp had dropped her and
    another woman off at bars "on Buford Hwy to solicit some men for
    sex."  The female victim brought the male victim back to her room at
    the Buckhead Red Roof, and when the male victim refused to pay the

agreed upon price after the two had sex, her pimp "came into the room and the took the rest of the money at gunpoint."

k.  On or about May 2013, police cited a man at the Buckhead Red Roof "for loitering for sex."  Police first encountered the man and female companion in the hotel lobby.  The man later told police that the woman he was with "refused to give him a blow job even though he was paying her."

l.  On or about May 2013, during an undercover operation conducted by the Dekalb County Police Department Vice Unit, police arrested two women for prostitution at the Buckhead Red Roof after responding to an advertisement on Backpage.com.

m. On or about July 2013, police responded to the Buckhead Red Roof after a woman was beaten by the man and two women she had been staying with at that location when she told them she wanted to leave. The woman reported to police that the group who beat her had been involved with "solicitation activity" and that they "frequent[ed] this motel and [got] different rooms frequently as well."  Though the woman said she had been with the group "for about a month," she had "no accurate information" to identify the suspects.

n.  On or about May 2014, an undercover operation conducted by the Dekalb County Vice Unit at the Buckhead Red Roof resulted in two arrests for prostitution and a third for possession of a stolen firearm. The two women arrested for prostitution were seen leaving a first-floor room on the way to a third-floor room where they had arranged to meet the undercover officer for sex.  When police searched the first-floor room after the takedown, they found two other women accompanied by a man in possession of a stolen firearm.  The women reported to police that the man had instructed them the previous day to hide the firearm in one of their purses.

o.  On or about April 10, 2016, Brookhaven Police Officers patrolling the area in response to an "increase of illegal narcotics and prostitution activity in the immediate area" encountered a man who had rented a room using a forged Illinois ID waiting in a car in the parking lot.  In the room the man had rented, officers found a 17-year-old girl and a 41-year-old man who told officers he came to the hotel in response to an advertisement he found on Backpage.

45.

RRI and RRI West require their corporate locations, including the Buckhead Red Roof, to send all safety and security reports, including crime and incident reports such as the above, directly to RRI and RRI Weset.  Defendants knew or should have known of sex trafficking, prostitution, and other criminal activity existing at the Buckhead Red Roof prior to Plaintiff's sex trafficking at the Buckhead Red Roof.

## <u>Guest Reports to Defendants of Prostitution, Crime, and Sex Trafficking</u>

46.

Defendants had actual or constructive knowledge of publicly available online reviews of the Buckhead Red Roof reporting widespread prostitution and crime occurring at the hotel.  Defendants have represented that prior to and during Plaintiff's trafficking, that their "president receives all of our TripAdvisor reviews to his email daily."

47.

General Managers at the Buckhead Red Roof reviewed all online complaints and reviews of the hotel on a daily basis.

48.

Defendants knew or should have known of the following reviews of the

Buckhead Red Roof:

A July 2012 review stated:

I was surprised, however, at **all of the open drug dealing going on in the rooms and parking lot**... . I complained upon checkout.  They had a practiced look of surprise on their faces but I do not believe for a minute that the staff does not know what is going on in this hotel.

A July 2012 review, stating:

Prostitution sting.  **During the stay, there was a prostitution sting.** The next night at 2:00 AM, a prostitute knocked on my door wanting to know if I wanted "company."

A 2014 review, stating:

Dirty orgy smell in both rooms I had.  Smoke like smell only drowned out by the semen and bleach.  Weird activity late at night.  **Pimp next door wasn't happy with his ladies take for the night apparently.**

A May 2016 review, stating:

... it was pretty obvious that the **local prostitutes were visiting a room a few doors down.  Something I know RRI is pretty familiar with.**

An August 2016 review, stating:

Within the first hour, my brother and his friend were **approached by prostitutes who wanted them to come with them.**

A 2016 review, stating:

**If prostitutes and drugs are what your looking for this is your spot** .... Passed out vomitus covered people in parking lot 2 days out of three.  Seman splattered on mirror... . Felt so bad for the "working women" with their personal items in garbage bags that I gave away 3 tote bags.

A November 2016 review, stating:

The **hotel was being used by prostitutes** and Shady characters were always coming and going.

A December 2016 review, stating:

Drug dealers and **pimps hanging around outside** ... .

49.

Defendants knew or should have known of other reviews and complaints of crime, prostitution, and sex trafficking which were reported directly to RRI and RRI West and through their online reputation management system.

50.

As a direct and proximate result of Defendants' acts and omissions, W.R. suffered substantial physical, emotional, and psychological harm and other damages.

## COUNT I
## NEGLIGENCE: SEX TRAFFICKING

51.

Plaintiff incorporates paragraphs 1 through 50 as if fully set forth herein.

52.

Defendants knew or should have known the steps to take to prevent the Buckhead Red Roof from being used as a market for Plaintiff's sex trafficking.

53.

Defendants negligently failed to train their employees, managers, and agents on the Department of Homeland Security ("DHS") guidelines to identify warning signs that indicate the presence of sex trafficking on the hotel premises such as:

a)    persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

b)    persons who lack freedom of movement or are constantly monitored;

c)    persons who have no control over or possession of money or ID;

d)    persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

e)    requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

f)      the presence of multiple computers, cell phones, pagers, credit card

        swipers, or other technology in the room;

g)      extended stay with few or no personal possessions in the room;

h)      excessive amounts of sex paraphernalia in rooms (condoms, lubricant,

        lotion, etc.);

i)      the same person reserves multiple rooms;

j)      a room is rented hourly, less than a day, or for an atypical extended

        stay;

k)      attempts to sell items to or beg from patrons or staff;

l)      cars in the parking lot regularly parked backward, so the license plates

        are not visible;

m)      loitering and solicitation of male patrons;

n)      waiting at a table or bar and picked up by a male (trafficker or

        customer);

o)      persons asking staff or patrons for food or money; and

p)      persons taking cash or receipts left on tables.

54.

In spite of its knowledge about the illegal activity at the Buckhead Red

Roof, including multiple reports and arrests related to prostitution and other sex

crimes prior to Plaintiff's sex trafficking, Defendants negligently failed to

implement any measures to protect their invitees, including Plaintiff, from

becoming victims of sex trafficking at the Buckhead Red Roof and continued their

venture to profit from the operation of the Buckhead Red Roof and the prostitution

and sex trafficking which occurred therein.

55.

Defendants negligently failed to implement policies and procedures to

prevent, identify, and deter prostitution and sex trafficking in their hotels and to

ensure they were not profiting from sex trafficking, as required by state and federal

law.

56.

At all relevant times, Defendants controlled the operation and management

of the Buckhead Red Roof and had the legal duty to keep the premises in a state

consistent with due regard for the safety of their invitees, including Plaintiff.

Defendants also voluntarily undertook actions that created additional duties to

provide adequate safety and security at the Buckhead Red Roof. Defendants

breached said duties and failed to act as similarly situated businesses would in like

circumstances.

25

57.

Prior to and including the time when Plaintiff was trafficked at the Buckhead
Red Roof, Defendants negligently maintained, inspected, secured, patrolled, and
managed the Buckhead Red Roof.  Defendants had knowledge, both actual and
constructive, of the need to properly maintain, secure, inspect, patrol, and manage
the premises, but negligently failed to exercise ordinary care, thereby creating an
unreasonable risk of injury to invitees, including Plaintiff.

58.

Defendants had actual and constructive knowledge of the dangerous and
hazardous conditions existing at the Buckhead Red Roof due to the knowledge of
their employees and agents and due to the prior criminal activity and dangers
associated with the property and surrounding high crime area.

59.

Plaintiff's sex trafficking was foreseeable to Defendants because they knew
or should have known about the actual events with Plaintiff, as well as the history
of prostitution and sex trafficking at the Buckhead Red Roof and other hotels in the
area and the history of criminal activity at and around the Buckhead Red Roof and
in the surrounding high-crime area.  Thus, Defendants owed a duty to invitees like

Plaintiff to exercise ordinary care in keeping the premises and approaches safe from criminal activity, especially sex trafficking.

60.

Defendants breached the duty owed to Plaintiff by failing to exercise ordinary care to keep their premises safe and negligently permitting prostitution and other criminal activity, especially sex trafficking, to exist and remain at the Buckhead Red Roof.

61.

Defendants knew of, or in the exercise of ordinary care, should have known of the dangerous and hazardous conditions existing on the premises, and the failure to maintain, inspect, secure, patrol, and manage the premises, and that these conditions were likely to, and did, result in prostitution and sex trafficking previously at the Buckhead Red Roof and again to Plaintiff.

62.

Defendants had actual and constructive knowledge of criminal activity, including prostitution and sex trafficking, at and around the Buckhead Red Roof prior to Plaintiff's sex trafficking.

63.

Despite their actual and constructive knowledge of criminal activity, including prostitution and sex trafficking, Defendants negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

64.

Despite their actual and constructive knowledge of criminal activity, Defendants negligently failed to warn Plaintiff or other invitees of the dangers at and around the Buckhead Red Roof.

65.

Despite their actual and constructive knowledge of prostitution, sex trafficking, and other criminal activity, Defendants negligently failed to maintain adequate security devices and personnel to permit proper use of the property, thereby causing an unreasonable risk of injury to invitees, including Plaintiff.

66.

Despite their actual and constructive knowledge of prostitution, sex trafficking, and other criminal activity, Defendants negligently failed to maintain policies, procedures, or systems of investigating, reporting and warning of sex trafficking and other crimes, and negligently maintained the Buckhead Red Roof.

67.

Despite their actual and constructive knowledge of criminal activity, Defendants failed to take appropriate action to remedy or reduce the danger to their invitees and allowed the dangerous environment at the Buckhead Red Roof to worsen and continue to exist unabated, thereby creating a nuisance.

68.

Because Defendants had knowledge of, or in the exercise of reasonable care should have had knowledge of the dangerous environment at and around the subject premises, Defendants are liable for the negligent supervision, hiring, training, and retention of its employees and the entrustment of said property to their agents and employees. Said negligence proximately caused the damages and injuries to Plaintiff.

69.

Defendants negligently represented to invitees that the Buckhead Red Roof was properly maintained, and that the property was safe.

70.

Defendants were negligent and said negligence proximately caused Plaintiff's injuries in the following ways, to-wit:

a)      Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary

29

care to keep the premises safe;

b)    Negligently failing to keep the premises in a state of good repair;

c)    Negligently violating O.C.G.A. § 41-1-1 by creating and maintaining a nuisance;

d)    Negligently failing to provide appropriate and effective security personnel during Plaintiff's sex trafficking at the hotel;

e)    Negligently failing to properly inspect and maintain the premises;

f)    Negligently failing to properly train and supervise their employees regarding prostitution and sex trafficking at the hotel;

g)    Negligently failing to properly retain, hire, train, and supervise said employees;

h)    Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

i)    Negligently failing to respond to online reviews and publicly available information;

j)    Negligently failing to prevent loitering and trespassing;

k)    Negligently failing to remove loiterers and trespassers;

l)    Negligently failing to inspect, patrol, or appropriately monitor the property;

m)    Negligently failing to provide adequate lighting and employ other available security measures, personnel, and devices, such as controlled access, adequate signage, cameras, patrols, inspections, physical, and other landscaping adjustments, and other measures available;

n)    Negligently failing to remediate a long history of crime at the Buckhead Red Roof and the area nearby;

o)    Negligently failing to warn invitees of known hazards at the property; and

p)    Negligently representing to invitees that the property was safe.

71.

Each of the foregoing acts and omissions constitute an independent act of negligence on the part of Defendants and one or more or all above stated acts were the proximate causes of the injuries sustained by Plaintiff.  Defendants are liable for Plaintiff's injuries sustained, pain and suffering, the expenses of treatment and all other elements of damages allowed under the laws of the State of Georgia, including all special, compensatory, incidental, consequential, economic, and punitive damages.

72.

Defendants are liable for the sex trafficking of Plaintiff.

73.

As a victim of sex trafficking, Plaintiff's claims herein are timely pursuant to O.C.G.A. § 9-3-99.

74.

Defendants' negligence discussed in this count was a cause in fact and a proximate cause of Plaintiff's substantial physical, emotional, and psychological harm and other damages.

## COUNT II
## STATUTORY LIABILITY
## 18 U.S.C. § 1595(a)

75.

Plaintiff incorporates Paragraphs 1 through 74 as if fully restated herein verbatim.

76.

In violation of the TVPRA, 18 U.S.C. § 1595(a), Defendants knowingly benefitted from participation in a venture that Defendants knew or should have known violated the TVPRA.

77.

Defendants knowingly benefitted from Plaintiff's sex trafficking by receiving a percentage of the revenue generated by the operation of the Buckhead Red Roof, including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff was trafficked.

78.

Defendants participated in a venture by associating with Plaintiff's sex traffickers, facilitating Plaintiff's sex trafficking through its operation of the hotel, and providing to Plaintiff's traffickers the necessary venue for Plaintiff's sex trafficking. In the course of this venture, multiple men paid to have sex with W.R. at the Buckhead Red Roof.

79.

The venture in which Defendants participated was in or affecting interstate commerce.

80.

Defendants knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants, their agents and representatives, had the opportunity to observe Plaintiff and another victim at the hotel, with and without her traffickers, the signs of a sex trafficking victim exhibited by Plaintiff,

her traffickers, and the rooms in which she was trafficked, and the frequent traffic of male buyers to W.R.'s rooms.

81.

Defendants knew or should have known the venture violated the TVPRA because Plaintiff asked Defendants' employees for help after she was physically injured through her sex trafficking, but Defendants' employees provided none.

82.

Defendants knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants, their agents and representatives, knew or should have known of other sex trafficking and sex crimes at the hotel in the years and months before Plaintiff was trafficked for sex at the Buckhead Red Roof.

83.

Defendants are directly and vicariously liable under § 1595(a) for the actions of their agents and representatives.

84.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendants' participation in this venture.

85.

Defendants are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

86.

All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff, whose damages were proximately caused by the acts discussed in this count.

## DAMAGES

87.

Plaintiff incorporates Paragraphs 1 through 86 as if fully set forth herein.

88.

As a proximate and foreseeable result of the Defendants' negligence and violations of the TVPRA and Georgia law, Plaintiff sustained personal injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiff brings each and every claim permissible under Georgia and federal law against Defendants for injuries suffered in the incident at issue, and to recover for all special damages, economic losses,

medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and punitive damages permissible under Georgia law. Plaintiff seeks all compensatory, special, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

a)   Personal injuries;

b)   Past, present and future conscious pain and suffering;

c)   Loss of enjoyment of life;

d)   Medical expenses;

e)   Mental anguish and emotional distress;

f)   Loss of past, present, and future wages;

g)   Incidental expenses;

h)   All special, compensatory, economic, punitive, and other damages permissible under Georgia and federal law; and

i)   Consequential damages to be proven at trial.

89.

Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of Defendants and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a

conscious indifference to consequences.

90.

Defendants' actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover her necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiff is entitled to all expenses of litigation and attorneys' fees pursuant to all other Federal and Georgia statutory and common laws.

WHEREFORE, Plaintiff prays for a judgment to be awarded to her and against Defendants for the following:

a)   Process issue as provided by law;

b)   Plaintiff be awarded actual damages in amounts to be shown at trial from Defendants;

c)   Plaintiff be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendants;

d)   Plaintiff be awarded a trial by jury; and

e)    Plaintiff have such other relief as this Court deems just and appropriate

under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

This 25th day of July, 2022.

Respectfully submitted,

**LAW & MORAN**

/s/ Denise D. Hoying
Peter A. Law
Georgia Bar No. 439655
pete@lawmoran.com
E. Michael Moran
Georgia Bar No. 521602
mike@lawmoran.com
Denise D. Hoying
Georgia Bar No. 236494
denise@lawmoran.com
Attorneys for Plaintiff

**LAW & MORAN**
563 Spring Street, NW
Atlanta, Georgia 30308
Phone: (404) 814-3700
Facsimile: (404) 842-7710

38

**ANDERSEN, TATE & CARR, P.C.**

/s/ Patrick J. McDonough
Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Jonathan S. Tonge
Georgia Bar No. 303999
jtonge@atclawfirm.com
Attorneys for Plaintiff

**ANDERSEN, TATE & CARR, P.C.**
One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
Phone: (770) 822-0900
Facsimile: (770) 822-9680